# METRO MACHINE CORPORATION

### v.

# MICHAEL MIZENKO

Record No. 910726

June 5, 1992

Present: All the Justices

*F. Nash Bilisoly (Thomas J. Duff; Vandeventer, Black, Meredith & Martin,* on briefs), for appellant.
*Ralph Rabinowitz (Rabinowitz, Rafal, Swartz, Taliaferro & Gilbert,* on brief), for appellee.

JUSTICE WHITING delivered the opinion of the Court.

In this case, we decide whether an injured worker was the borrowed servant of the defendant and, if so, whether that fact precludes his federal maritime law negligence claim against the defendant.

Michael Mizenko, a skilled laborer, was employed by Abacus Temporary Services (Abacus), a company that had contracted to supply Metro Machine Corporation (Metro) with skilled labor on request. Pursuant to its contract, Abacus sent Mizenko to work for Metro in the performance of Metro's contract for the "multi-faceted overhaul and repair" of the USS COMPTE DE GRASSE, a naval vessel afloat in the navigable waters of the United States and moored at Metro's shipyard in Norfolk.

On May 8, 1986, Mizenko was injured while repairing pipes on the USS COMPTE DE GRASSE. Mizenko collected workers' compensation benefits from Abacus pursuant to the Longshore and Harbor Workers' Compensation Act (the Federal Act), 33 U.S.C. §§ 901, *et seq.* Later, Mizenko filed this federal maritime negligence action against Metro and Electric Motor and Contracting Co., Inc. (Electric).

Metro filed pleadings in which it alleged that because Mizenko was Metro's borrowed servant under the Federal Act and Metro was Mizenko's statutory employer under the Virginia Workers' Compensation Act, Code § 65.1-1, *et seq.* (the Virginia Act), the exclusivity provisions of both acts barred Mizenko's negligence action against it. Accordingly, Metro filed a plea in bar, requests for admission that were not denied, and a motion for summary judgment in support of its contention.

On November 14, 1989, after argument of counsel and consideration of briefs filed on the issue, Judge Morris B. Gutterman issued

an opinion letter in which the court "denied" Metro's motion for summary judgment "at this time." An order was entered in conformity with that opinion letter on January 26, 1990.

Thereafter, Metro filed another plea, citing the case of *McBride* v. *Metric Constructors*, 239 Va. 138, 387 S.E.2d 78 (decided January 14, 1990), and asserting that the exclusivity provision of the Virginia Act, Code § 65.1-40 (now Code § 65.2-307), barred Mizenko's negligence claim against Metro. Electric filed a similar plea.[1] This time, both pleas were sustained and Mizenko's action was accordingly dismissed.

When Mizenko appealed the trial court's dismissal of his case, Metro filed this separate appeal of the trial court's earlier adverse disposition of its summary judgment motion. In this opinion, we decide Metro's separate appeal.

## I.

■ At the outset, Mizenko claims that this appeal is procedurally barred. Mizenko correctly contends that Metro could not have appealed the trial court's disposition of its motion for summary judgment because it was not a final order or disposition of the case. However, he incorrectly claims that such a disposition cannot be appealed after entry of the final order. Judge Gutterman's decision was an adjudication of one of the principles of the action that may be appealed after entry of the final judgment. *Allen* v. *Parkey*, 154 Va. 739, 749, 149 S.E. 615, 619 (1929), *aff'd*, 154 Va. 739, 750, 154 S.E. 919, 919 (1930). Therefore, Metro's appeal is not procedurally barred.[2]

---

[1] Electric was a subcontractor of Metro. Electric's employees allegedly caused Mizenko's injuries in using a toxic solvent whose fumes Mizenko inhaled while working near those employees. In *Mizenko* v. *Electric Motor and Contracting Co.*, 244 Va. 152, 419 S.E.2d 637 (1992), this Court held that Mizenko could pursue his federal maritime negligence action against Electric because the Federal Act did not abrogate Mizenko's right, and the federal interests involved outweighed the state interests in enforcing the exclusivity provision of the Virginia Act.

[2] Metro made known its specific objection to the court's denial of its motion for summary judgment by objecting to the order, and by briefing and arguing its borrowed servant defense. Metro's actions afforded opposing counsel an opportunity to respond to Metro's contention, and afforded the trial court an opportunity to rule intelligently on the issue presented. Accordingly, Metro made a timely objection in conformity with Rule 5:25 and preserved its right of appeal. *Weidman* v. *Babcock*, 241 Va. 40, 44, 400 S.E.2d 164, 167 (1991).

II.

The borrowed servant doctrine is a long-standing principle that has been applied in conjunction with the Federal and State Acts. *Huff* v. *Marine Tank Testing Corp.*, 631 F.2d 1140, 1144 (4th Cir. 1980); *Gaudet* v. *Exxon Corp.*, 562 F.2d 351, 355, 357 (5th Cir. 1977), *cert. denied*, 436 U.S. 913 (1978); *Ideal Laundry* v. *Williams*, 153 Va. 176, 179, 149 S.E. 479, 480 (1929). Under the borrowed servant doctrine, a worker, although directly employed by one entity, may be transferred to the service of another so that he becomes the employee of the second entity "with all the legal consequences of the new relation." *Standard Oil* v. *Anderson*, 212 U.S. 215, 220 (1909). One of the legal consequences of the "new relation" is that workers' compensation is the injured employee's exclusive remedy against the second entity-employer. *Gaudet*, 562 F.2d at 356; *see McBride* v. *Metric Constructors*, 239 Va. 138, 140, 387 S.E.2d 780, 781 (1990); *Coker* v. *Gunter*, 191 Va. 747, 757, 63 S.E.2d 15, 19 (1951).

Initially, we consider whether the circumstances under which Mizenko worked for Metro made him Metro's borrowed servant. Because Mizenko failed to answer Metro's request for admission, the facts set forth in the request are deemed admitted. Rule 4:11. And what follows is a summary of the admitted facts.

Abacus personnel were sent to Metro to be interviewed by the foreman of the appropriate shop. The foreman was authorized to accept or reject the Abacus applicants. Under the terms of the contract, Metro retained the right to remove and replace Abacus personnel that Metro considered unsatisfactory.

Mizenko was sent to Metro on February 4, 1985, and was interviewed by the foreman of the pipe shop, who accepted Mizenko for employment. Mizenko worked as a pipe fitter at Metro until March 16, 1986, when he was laid off. At that time, Abacus sent Mizenko to the Jonathan Corporation, where he worked from March 17 until April 6, 1986. Mizenko was thereafter reassigned to Metro, where he worked until May 8, 1986.

During his employment at Metro, Mizenko reported directly to Metro and received his daily work assignments from the Metro pipe shop foreman. His work was supervised and directed by Metro.

Abacus billed Metro weekly for the total number of hours its employees, including Mizenko, worked. Metro paid Abacus an hourly

rate for Mizenko's work and Abacus in turn paid Mizenko. Abacus neither supervised nor provided tools or equipment to Mizenko.

All parties agree that control over the employee is the most important factor in consideration of the borrowed servant status, although it alone may not be dispositive. *Gaudet*, 562 F.2d at 355-56; *Ruiz* v. *Shell Oil Co.*, 413 F.2d 310, 312-13 (5th Cir. 1969); *Coker*, 191 Va. at 753, 63 S.E.2d at 17. Factors generally accepted as appropriate considerations in this area were delineated in *Ruiz*, 413 F.2d at 312-13, and *Gaudet*, 562 F.2d at 355. These include: (1) who has control over the employee and the work he is performing; (2) whether the work performed is that of the borrowing employer; (3) was there an agreement between the original employer and the borrowing employer; (4) did the employee acquiesce in the new work situation; (5) did the original employer terminate its relationship with the employee; (6) who is responsible for furnishing the work place, work tools and working conditions; (7) the length of the employment and whether it implied acquiescence by the employee; (8) who had the right to discharge the employee; and (9) who was required to pay the employee.

Because the material facts are not disputed, this issue would be one of law to be appropriately disposed of by summary judgment. *Gaudet*, 562 F.2d at 357-58. Applying the above considerations to the circumstances of this case leads us to the conclusion that Mizenko was indeed the borrowed servant of Metro. Metro exercised complete control over Mizenko's work and working conditions. The work being performed was Metro's work, and Metro had the right to remove or discharge Mizenko from that work pursuant to Metro's agreement with Abacus. Mizenko worked for Metro for over a year with a hiatus of only a single month. The fact that Mizenko received his pay check and workers' compensation from Abacus does not override these factors and, most significantly, does not discount the extensive control Metro exercised over Mizenko's employment. *See Melancon* v. *Amoco Prod. Co.*, 834 F.2d 1238, 1246-47, *amended as to costs*, 841 F.2d 572 (5th Cir. 1988).

Similarly, if a loaned or borrowed servant is under the control of the "borrowing" employer as to the work to be done and the time and method of doing it, the exclusivity provisions of the Virginia Act preclude his common law recovery for personal injuries against an employee of the borrowing employer because he is a fellow servant of the injured party. *Coker*, 191 Va. at 757, 63 S.E.2d at

19. The exclusivity provisions also bar a similar claim by a borrowed servant against the borrowing employer. *Id.*

Accordingly, we think that the admitted facts in this case demonstrate that Mizenko was Metro's borrowed servant as a matter of law under either the Federal or the State Act.

■ Finally, we consider Mizenko's argument that the borrowed servant doctrine is no longer applicable in employment-related injury cases within the coverage of the Federal Act as a result of 1984 amendments to that Act. In 1984, Congress adopted a number of amendments to the Federal Act, some of which were in response to a case decided by the United States Supreme Court, *Washington Metropolitan Area Transit Authority* v. *Johnson*, 467 U.S. 925 (1984).

In *Johnson*, the Court interpreted the statutory language of the Federal Act as entitling a general contractor to immunity from tort suits filed by a subcontractor's employees *unless* the general contractor neglected to secure workers' compensation coverage after the subcontractor failed to do so. *Id.* at 939-40. This holding made immunity for general contractors the rule rather than the exception. Congress quickly amended the Federal Act to provide that a general contractor would be *deemed* an employer and, therefore, clothed with an employer's immunity *only* when it was required to secure the payment of workers' compensation because the subcontractor had failed to do so. Thus, the statutory grant of immunity corresponded to the requirement of securing payment of workers' compensation.

Following these amendments, courts have held uniformly that this congressional action did not abrogate the application of the borrowed servant doctrine in these circumstances. The Fifth Circuit, the first court to address this issue, identified the distinction between a statutory description of circumstances which *deems* one to be an "employer," although not the true employer, and circumstances under which one *is* the employer under the borrowed servant doctrine in *West* v. *Kerr-McGee Corp.*, 765 F.2d 526, 530-31 (5th Cir. 1985). This distinction, coupled with the legislative history of the amendments which the court found to be directed solely to "overrule WMATA and not to amend the borrowed-servant doctrine or otherwise modify [the Federal Act]," *id.* at 530, resulted in the Fifth Circuit's conclusion that the borrowed servant doctrine was not abrogated by the 1984 amendments to the Federal Act.

The Third Circuit has followed the Fifth Circuit's lead. In *Peter v. Hess Oil Virgin Islands Corp.*, 903 F.2d 935 (3d Cir. 1990), *cert. denied*, ___ U.S. ___, 111 S. Ct. 783 (1991), the court stated:

> *West*'s reading of the legislative history is correct; there is nothing in the legislative history indicating that Congress intended to do anything other than overrule *Washington Metro.* . . . [and] [t]hat brief history does not support the proposition that Congress wished to upset the use of the borrowed servant doctrine as utilized by the Fourth and Fifth Circuit cases . . . .

*Id.* at 941; *see also Melancon*, 834 F.2d at 1243-44; *Alexander* v. *Chevron, U.S.A.*, 806 F.2d 526, 529 (5th Cir. 1986), *cert. denied*, 483 U.S. 1005 (1987); *Capps* v. *N.L. Baroid-NL Indus., Inc.*, 784 F.2d 615, 616-17 (5th Cir.), *cert. denied*, 479 U.S. 838 (1986); *Doucet* v. *Gulf Oil Corp.*, 783 F.2d 518, 522 (5th Cir.), *cert. denied sub nom. Gulf Oil Corp.* v. *Danos & Curole Marine Contractors, Inc.*, 479 U.S. 883 (1986).

Mizenko invites us to reject the analysis of these cases, although he offers no case supporting his position. We decline this invitation. We, like the courts that have already considered this issue, cannot find any statutory language or congressional intent in the 1984 amendments to abrogate the maritime law principle of borrowed servant. Thus, we think that the borrowed servant doctrine continues to be available when considering work-related injuries encompassed by the Federal Act.

█ Since the exclusivity provisions of both acts bar Mizenko's action against Metro, we find that Judge Gutterman erred in denying Metro's motion for summary judgment. Nevertheless, because the trial court ultimately dismissed Mizenko's claim against Metro, although for the wrong reason, we will affirm its action in doing so and assign the right reason. *State Farm Mut. Auto. Ins. Co.* v. *Seay*, 236 Va. 275, 280 n.3, 373 S.E.2d 910, 913 n.3 (1988); *Robbins* v. *Grimes*, 211 Va. 97, 100, 175 S.E.2d 246, 248 (1970).

*Affirmed.*

JUSTICE COMPTON, with whom CHIEF JUSTICE CARRICO and JUSTICE LACY join, concurring.

I concur in the result in this case but not in the *ratio decidendi*. The opinion characterizes the nature of Mizenko's action as a ''federal maritime law negligence claim.'' From this basis, this Court's ruling proceeds to the conclusion that the exclusivity provisions of both the Federal and Virginia acts bar Mizenko's action against Metro.

I do not agree that the plaintiff's action is a ''federal maritime law negligence claim.'' In my opinion, the plaintiff's claim is a common law negligence action, as so clearly articulated in JUSTICE LACY's dissent in *Mizenko* v. *Electric Motor and Contracting Co., Inc.*, 244 Va. 152, 419 S.E.2d 637 (1992), decided today.

JUSTICE KEENAN, dissenting.

While I do not dispute the majority's analysis that Mizenko is the borrowed servant of Metro, nevertheless, I would hold that Metro's appeal of this interlocutory order is procedurally barred by Code § 8.01-670.[1] Pursuant to that section, Metro could only appeal from the final judgment order entered in this case. It did not do so.

The trial court's order of January 26, 1990, which denied Metro's initial motion for summary judgment, and from which Metro has appealed, is not a final order. A final order is one which disposes of the entire action and leaves nothing to be done except the ministerial superintendence of execution of the order. *Daniels* v. *Truck Corporation*, 205 Va. 579, 585, 139 S.E.2d 31, 35 (1964); *Marchant* v.

---

[1] Code § 8.01-670 provides:

A. Any person may present a petition for an appeal to the Supreme Court if he believes himself aggrieved:

1. By any judgment in a controversy concerning:

a. The title to or boundaries of land,

b. The condemnation of property,

c. The probate of a will,

d. The appointment or qualification of a personal representative, guardian, committee, or curator,

e. A mill, roadway, ferry, wharf, or landing,

f. The right of the Commonwealth, or a county, or municipal corporation to levy tolls or taxes,

g. The construction of any statute, ordinance, or county proceeding imposing taxes; or

2. By the order of a court refusing a writ of quo warranto or by the final judgment on any such writ; or

3. By a final judgment in any other civil case; or

B. Any party to any case in chancery wherein there is an interlocutory decree or order:

1. Granting, dissolving or denying an injunction; or

2. Requiring money to be paid or the possession or title of property to be changed; or

3. Adjudicating the principles of a cause.

*Mathews Co.*, 139 Va. 723, 734, 124 S.E. 420, 423 (1924). Following the order denying Metro's initial summary judgment motion of January 26, 1990, Metro remained a party defendant in this action at law. Thus, the January 26, 1990 order, which is the subject of this appeal, is not a final order. *Id.*

On February 28, 1991, Metro was dismissed from the case with prejudice. That was the final order in this case, and it is the order from which *Mizenko* has appealed. In the final order, Metro did not preserve its objection to the trial court's earlier denial of summary judgment. Further, Metro did not appeal any aspect of this order.

*Allen* v. *Parkey*, 154 Va. 739, 749, 149 S.E. 615, 619 (1929), *aff'd, Allen* v. *Parkey*, 154 Va. 739, 750, 154 S.E. 919, 919 (1930), cited by the majority, is inapposite to the appeal before us. *Allen* involved an appeal from an interlocutory decree in chancery which adjudicated the principles of a cause. Such decrees may be appealed under the special provision of Code § 8.01-670(B)(3). No such special provision exists, however, for the appeal of an interlocutory order in an action at law such as the one presented here. Instead, Metro's appeal is governed and precluded by the general provision of Code § 8.01-670(A)(3) which states that "[a]ny person may present a petition for an appeal to the Supreme Court if he believes himself aggrieved . . . [b]y a final judgment in any other civil case."