COURT OF APPEALS OF VIRGINIA

Present:  Judges Fitzpatrick, Overton and Senior Judge Duff


LMI INSURANCE COMPANY

v.   Record No. 2670-96-4

JAMES FOLEY,
 TOWER ELECTRIC COMPANY,
 CANOVA ELECTRICAL CONTRACTING, INC.
 AND ROYAL INSURANCE COMPANY OF AMERICA

                                        MEMORANDUM OPINION[*] BY
LMI INSURANCE COMPANY                       CHARLES H. DUFF
                                            JULY 29, 1997
v.   Record No. 2671-96-4

CARLOS A. REAL,
 TOWER ELECTRIC COMPANY,
 CANOVA ELECTRICAL CONTRACTING, INC.
 AND ROYAL INSURANCE COMPANY OF AMERICA


            FROM THE VIRGINIA WORKERS' COMPENSATION COMMISSION

            (Cathie W. Howard; Pierce & Howard, P.C., on
            briefs), for appellant.  Appellant submitting
            on brief.

            (Benjamin J. Trichilo; Trichilo, Bancroft,
            McGavin, Horvath & Judkins, P.C., on briefs),
            for appellees Canova Electrical Contracting,
            Inc. and Royal Insurance Company of America.
             Appellees submitting on brief.

            No brief for appellee James Foley.

            No brief for appellee Tower Electric Company.

            No brief for appellee Carlos A. Real.


     LMI Insurance Company (LMI) appeals decisions of the

Workers' Compensation Commission holding it liable to James Foley

_____

        [*]Pursuant to Code § 17-116.010 this opinion is not
designated for publication.

and Carlos A. Real for workers' compensation benefits. LMI contends that the commission erred in finding that Real and Foley were not loaned employees of Canova Electrical Contracting, Inc. (Canova), but rather, were employees of Tower Electric Company (Tower) at the time of their industrial accidents. Because credible evidence supports the commission's decisions, we affirm. We decline to address the jurisdictional issue raised by the parties because our affirmance of the commission's decision on the "loaned employee" issue renders the jurisdictional issue moot.

On appeal, we view the evidence in the light most favorable to the prevailing party below. See R.G. Moore Bldg. Corp. v. Mullins, 10 Va. App. 211, 212, 390 S.E.2d 788, 788 (1990).

So viewed, the evidence established that on June 21, 1994 and July 10, 1994, respectively, Real and Foley, Tower's employees, sustained compensable industrial injuries while working as electricians at a Sears/Landmark renovation jobsite (the Landmark job) located in Northern Virginia. Tower filed two separate Employer's First Reports of Accident with the commission reporting both accidents.

All Interiors was the general contractor on the Landmark job. Canova, a company headquartered in Pennsylvania, was a subcontractor performing electrical work on the Landmark job renovation. In turn, Canova entered into a labor subcontract agreement with Tower, a Virginia company, for Tower to supply all

2

of the labor necessary to perform the electrical work.  The
agreement required Canova to furnish all necessary supervision
for the Landmark job.  The intent of the labor subcontract was
for Tower to provide Canova a pool of laborers for a limited
period of time while Canova worked on the Landmark job, and for
Tower to pay all fringe benefits for its workers, including
workers' compensation insurance.[1]

Glen Johnson, Tower's vice-president, testified that at the
end of the month, pursuant to the terms of Tower's subcontract
with Canova, Tower billed Canova for the total direct cost of the
labor Tower furnished for the Landmark job plus a sixty percent
mark-up.  Johnson sent Tower employees to the Landmark jobs upon
request from Canova's supervisor, Melvin Worrall.

Real believed Worrall was his foreman on the Landmark job.
Worrall routinely checked Real's work.  Real heard Worrall give
instructions to Brad Walport, Tower's foreman on the Landmark
job.  Real believed that Worrall could terminate his employment.
Worrall recorded Real's hours worked and gave Real his
paychecks.  On the day of his accident, Real received his work
instructions from Walport.

Foley did not consider himself an employee of Canova, but
believed that he was employed by Tower.  Foley received his
paychecks from a Tower foreman.  Foley had been instructed to

[1]Pursuant to a policy for workers' compensation insurance
and employer's liability insurance, LMI insured Tower for the
period from August 1, 1993 through August 1, 1994.

3

report to Worrall when he arrived at the Landmark job. Foley stated that a Tower official told him he was on loan to Canova for a temporary period. Immediately preceding Foley's accident, Worrall instructed Foley to climb the scaffold to work on some lighting. Foley stated that Walport acted as the Tower supervisor on the Landmark job. Foley received most of his instructions from Walport. Walport told Foley who to work with and where to go. Foley had twenty years experience as an electrician.

Walport, a skilled electrician, testified that he acted as Tower's sub-foreman on the Landmark job. Walport assigned the laborers to various tasks under the direction of Worrall, from whom Walport received his instructions. Walport believed that Worrall gave raises to several Tower employees who worked on the Landmark job.

Denise Gold, Tower's office manager, testified that Worrall or Thomas L. Mattey turned in the time sheets for Tower's employees each week, and then one of them picked up the paychecks for the week for Tower's employees on the Landmark job and delivered the checks to the employees. Gold stated that the raises received by Tower employees on the Landmark job were only effective during that job. Tower billed Canova for performing the payroll function.

Thomas L. Mattey testified that he acted as a supervisor for Canova on the Sears/Fair Oaks job (the Fair Oaks job). Mattey

4

relied heavily upon a Tower employee, Charlie Jones, to relay instructions and directions to the approximately thirteen to fifteen Tower employees on the Fair Oaks job. Mattey verified that the Tower employees were doing what they were supposed to do once Jones had assigned them to work. If a task had not been done in accordance with the general contractor's plans and specifications, Mattey notified Jones, who then instructed Tower's employees to make the correction. Tower's employees notified Jones or Tower if they were going to be late or absent from work. Tower's workers provided their own hand tools. Canova provided the larger equipment, such as scaffolding. Mattey had no authority to hire or fire the Tower employees on the Fair Oaks job. All Interiors also had a supervisor on the Fair Oaks job, Anthony Gulianno. Mattey reported to Gulianno every day. At most, Mattey had three to four additional Canova employees at the Fair Oaks job.

James Canova, Canova's president and owner, testified that Canova had a subcontract with Sears to renovate two stores in Northern Virginia. Canova then entered into a labor subcontract with Tower for Tower to provide the labor for the Sears jobs. Worrall acted as Canova's superintendent on the Landmark job. Worrall received his instructions from All Interiors, and then relayed those to Tower's foreman, who then directed the Tower workers. Canova sent four to five of its own electricians to work on the Landmark job. Walport supervised the Tower employees

on the Landmark job.  Walport reported to Worrall, who told Walport what needed to be done.  James Canova understood that a portion of the sixty-percent mark-up charged by Tower to Canova included Tower's cost for workers' compensation coverage for its workers.  James Canova testified that his company had no authority to hire or fire Tower's employees.  If Canova was dissatisfied with a Tower employee, it sent the employee back to the Tower office.

Worrall testified that he told Walport what needed to be done on the Landmark job.  If Worrall found that a task had not been done correctly, he told Walport to correct the problem, and Walport made sure that his employees did so.  If Worrall was displeased with a Tower employee, he sent the employee back to Tower's office.  Worrall faxed the Tower employees' hours to Tower's office each week so that Tower could do the payroll.  Walport distributed the paychecks at the jobsite.  Worrall did not inspect Tower's work every day, but performed walk-throughs on a regular basis.  Worrall gave Walport the blueprints for the Landmark job for Tower to use in performing the electrical work.

Ken Pluebell, Tower's president, testified that Tower agreed to provide Canova labor for the Landmark job at Tower's cost plus a sixty-percent mark-up.  In exchange, Tower agreed to be responsible for all fringe benefits, including taxes and overhead, which included workers' compensation insurance coverage.

In affirming the deputy commissioner's decision, the full commission held that Real and Foley were Tower's employees and were not loaned employees to Canova. The commission found that although Tower and Canova exercised some control over Real and Foley, Tower, through its on-site supervisor, Walport, exercised

7

the stronger and more direct control, giving Real and Foley their day-to-day assignments.  In addition, the commission noted that Tower assigned employees to the jobsite, paid them, and reassigned them if requested by Canova.

The commission noted that Canova's limited control was not similar to the control exercised by the special employer in Virginia Polytechnic Inst. v. Frye, 6 Va. App. 589, 371 S.E.2d 34 (1988), where the special employer "exclusively and completely" controlled the employee.  The commission further noted that Canova's control was not similar to the "complete control" exercised by the special employer in Metro Mach. Corp. v. Mizenko, 244 Va. 78, 419 S.E.2d 632 (1992).

In Mizenko, the Supreme Court recognized that "control over the employee is the most important factor in consideration of [loaned employee] status, although it alone may not be dispositive."  Id. at 83, 419 S.E.2d at 635.  The factors "generally accepted as appropriate considerations" for determining whether an employee is a "loaned employee" are as follows:

> (1) who has control over the employee and the work he is performing; (2) whether the work performed is that of the borrowing employer; (3) was there an agreement between the original employer and the borrowing employer; (4) did the employee acquiesce in the new work situation; (5) did the original employer terminate its relationship with the employee; (6) who is responsible for furnishing the work place, work tools and working conditions; (7) the length of the employment and whether it implied acquiescence by the employee; (8) who had the right to discharge

8

> the employee; and (9) who was required to pay
> the employee.

Id.

"On appellate review, the factual findings of the commission are binding if they are supported by credible evidence." Wagner Enters., Inc. v. Brooks, 12 Va. App. 890, 894, 407 S.E.2d 32, 35 (1991).  Here, the commission's findings that Foley and Real were Tower's employees and were not loaned employees of Canova are supported by credible evidence.  Even though the labor subcontract agreement between Tower and Canova required Canova to furnish all necessary supervision, the facts showed that Tower, through its on-site supervisor, Walport, actually exercised stronger and more direct control over the Tower employees than did Canova.  Walport assigned specific tasks to the workers on a daily basis.  Tower paid the workers and reserved the right to terminate them.  Although Canova had general supervisory authority over Foley and Real, its control was neither exclusive nor complete, as was the case in Mizenko and Frye.  Canova merely told Tower how many workers it needed and what work needed to be done in accordance with the blueprints and general contractor's specifications.  Foley testified that he received most of his supervision from Walport.  Foley did not consider himself to be a Canova employee.  Real testified that on the day of his accident, he received his instructions from Walport.  At no point in time did Tower terminate its employment relationship with Foley or Real.  In fact, Foley testified that he returned to employment

9

with Tower after recovering from his injuries.

Worrall, the Canova supervisor, testified that he allowed Walport to decide which workers would perform specific tasks. Worrall testified that he could not fire Tower's workers. Pluebell, Tower's president, testified that Tower retained ultimate authority over firing decisions. In addition, Pluebell admitted that the intent of the agreement was for Tower to supply workers' compensation coverage for its workers. Moreover, the duration of the employment was temporary, not long-lasting.

Because credible evidence supports the commission's findings that Tower was Foley's and Real's employer and that Canova was not their special master, those findings are binding and conclusive upon this Court on appeal. "The fact that there is contrary evidence in the record is of no consequence if there is credible evidence to support the commission's finding." Wagner, 12 Va. App. at 894, 407 S.E.2d at 35. "In determining whether credible evidence exists, the appellate court does not retry the facts, reweigh the preponderance of the evidence, or make its own determination of the credibility of the witnesses." Id.

For these reasons, we affirm the commission's decisions.

Affirmed.

10